1   **MIGLIACCIO & RATHOD LLP**
Selin Demir (SBN 331418)
2   Nicholas Migliaccio, *pro hac vice* anticipated
Jason Rathod, *pro hac vice* anticipated
3   Bryan Faubus, *pro hac vice* anticipated
388 Market Street, Suite 1300
4   San Francisco, CA 94111
*Attorneys for Plaintiff and Proposed Class*
5
*Attorneys for Plaintiff and Proposed Class*
6
**UNITED STATES DISTRICT COURT**
7   **NORTHERN DISTRICT OF CALIFORNIA**
8

| | |
|---|---|
| 9   ISAAC LANDRETH and JAIME MARQUEZ, Individually and on Behalf of All Others Similarly 10   Situated,<br><br>11                                          Plaintiff,<br><br>12                vs.<br><br>13   ROBINHOOD FINANCIAL, LLC, ROBINHOOD SECURITIES, LLC, 14   AND ROBINHOOD MARKETS LLC,<br>15<br>16<br>                            Defendants.<br>17 | CASE NO.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**(1) VIOLATIONS OF SECTION 10(B) OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 10B-5;**<br>**(2) VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW;**<br>**(3) BREACH OF FIDUCIARY DUTY**<br>**(4) BREACH OF IMPLIED COVENANT OF GOOD FAITH & FAIR DEALING;**<br>**(5) NEGLIGENCE;**<br>**(6) UNJUST ENRICHMENT; AND**<br>**(7) VIOLATIONS OF THE MAINE UNFAIR TRADE PRACTICES ACT**<br><br>**DEMAND FOR JURY TRIAL** |

18
19

20          Plaintiffs Isaac Landreth and Jaime Marquez ("Plaintiffs") allege the following based

21   upon the investigation of their counsel, which included a review of, among other things, United

22   States Securities and Exchange Commission ("SEC") filings by Robinhood Financial, LLC

23   ("Robinhood" or the "Company"), as well as regulatory filings and reports, press releases and

other public statements issued by Robinhood, and various agreements between Robinhood and its clients, except for allegations regarding his own acts, which are based on knowledge:

## **NATURE OF THE ACTION**

1.     This is a class action on behalf of all clients of Robinhood who placed trade orders with Robinhood between September 1, 2016, and June 30, 2019, (the "Class Period") which were not executed in accordance with Defendant's duty to secure the best execution available. Plaintiffs assert claims for violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5; violations of the California Unfair Competition Law; breach of fiduciary duty; breach of the implied covenant of good faith and fair dealing; negligence; unjust enrichment; and violations of the Maine Unfair Trade Practices Act, on behalf of themselves and all similarly-situated customers of Robinhood, a wholly owned subsidiary of co-defendant Robinhood Markets, Inc.

2.     Robinhood is a privately-owned financial services company that offers its customers the ability to self-direct their investments in stocks, ETFs, options, and cryptocurrency through its website and mobile application. Since its launch in 2015, Robinhood has grown into a multi-billion-dollar enterprise. With the stated mission to "democratize finance for all,"[1] the Company has targeted young adults—the median age of a Robinhood user is thirty one[2]—and

---

[1]     Our Mission, Robinhood.com, *available at* https://robinhood.com/us/en/support/articles/our-mission/ (*last visited* Feb.19, 2021).

[2]     *In re Robinhood Financial LLC*, Administrative Complaint, Docket No. E-2020-0047 (the "Massachusetts Complaint"), *available at* https://www.sec.state.ma.us/sct/current/sctrobinhood/MSD-Robinhood-Financial-LLC-Complaint-E-2020-0047.pdf.

novice investors through youth-forward marketing and an interface that "gamifies" investing.[3]

Robinhood encourages its largely unsophisticated customer base to trade frequently, most notably

by promising "commission-free investing" and offering "unlimited commission-free trades in

stocks, funds, and options."[4]

       3.    Robinhood's customers pay a hidden cost on each trade, however, one which often

exceeds the cost Robinhood's competitors' commissions. Robinhood accomplished this sleight

of hand through undisclosed arrangements that generate substantial profit for Robinhood in

exchanged for inferior execution quality for each and every one of its customers' trades. In order

to conceal these arrangements, the sizable revenue resulting therefrom, and their impact on

customer trade execution prices, Robinhood omitted, misrepresented, and concealed material

facts from its customers and the public. The SEC found that this scheme cost Robinhood's

customers approximately $34.1 million "even after netting the approximately $5 per-order

commission costs" charged by Robinhood's competitors.[5]

       4.    Robinhood, like all broker-dealers, owes its customers the duty of best execution.

Under Financial Industry Regulation Authority ("FINRA") and SEC rules, this duty requires

Robinhood to conduct "reasonable diligence to ascertain the best market for the subject security

---

[3]    *See*, *id.* at 12-14 (discussing Robinhood's strategies to encourage investor engagement with its application).

[4]    https://robinhood.com/; https://robinhood.com/signup.

[5]    *In re* Robinhood Financial, LLC, SEC Admin. Proceeding, File No. 3-20171 (Dec. 17, 2020) (order instituting administrative cease and desist proceedings) (hereinafter "Cease and Desist Order") at 10.

and buy or sell in such market so that the resultant price to the customer is as favorable as possible under prevailing market conditions."[6]

5.     Throughout the Class Period, Robinhood sought to conceal its practice of routing customer orders to a group of outside trading firms (the "Trading Partners") in exchange for compensation. This compensation is remitted to Robinhood either as "liquidity rebates" or "payment for order flow" (together, "PFOF") (*i.e.*, revenue to the Company) or "price improvement" (*i.e.*, improved prices for customer trade executions). Robinhood negotiated a compensation split that reduced price-improvement for its customers in order to boost its own revenues—approximately 20 per cent of the order flow compensation went to price improvement, while 80 per cent went to Robinhood. This inverted the industry standard, generating 400 per cent more revenue than the typical PFOF split, and reducing price improvement by 75 per cent. It was a lucrative arrangement: Robinhood's PFOF payments constituted the majority of its revenue during the Class Period.

6.     Until late 2018, Robinhood wholly concealed the fact that it generated revenue from PFOF, let alone that most of its revenue came from PFOF or that its arrangements deviated from industry standards. Throughout the Class Period Robinhood continually acknowledged that it owes its clients a duty of best execution and claimed to consider factors relevant to fulfilling such duty when routing clients' orders. It also expressly stated that its execution quality matched or surpassed competing retail brokers. After the media raised concerns about its PFOF arrangements in late 2018, Robinhood acknowledged that it relied on PFOF revenue while maintaining that its order execution quality was equal to or better than its competitors. This claim

---

[6]     FINRA Rule 5310.

CLASS ACTION COMPLAINT

was false, and senior personnel at Robinhood knew that it was false at the time, but the misleading statements remained on Robinhood's website until the end of June 2019.

7.     Robinhood's reliance on PFOF revenue and its poor execution quality are material facts. The Company omitted, concealed, and misrepresented its order flow practices and its execution quality to continue growing its customer base and encourage its customers to continue trading. Plaintiffs and other members of the Class relied on Defendant's misrepresentations regarding PFOF and execution quality, as well as Defendant's omissions regarding its reliance on PFOF, in continuing to use Robinhood's trading platform.

8.     Robinhood's failure to disclose these material facts regarding its actual order routing practices and execution quality caused Plaintiffs and the Class substantial harm in the form of, *inter alia*, higher prices for purchase orders, lower prices for sale orders, slower executions, lesser fill rates, and exposure to a greater risk of adverse selection, than they could have obtained by using a broker than fulfilled its legal and regulatory duties to provide best execution.

9.     Robinhood's material omissions and misrepresentations regarding its PFOF arrangements and execution quality were a breach of Robinhood's fiduciary duty to Plaintiffs and the Class and violated section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, among other laws.

10.     Plaintiffs hereby seek, on behalf of themselves and all similarly-situated clients of Robinhood, damages as well as restitution of benefits unjustly received by Robinhood at their expense.

CLASS ACTION COMPLAINT

## JURISDICTION AND VENUE

11.     Plaintiffs assert claims for violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5; violations of the California Unfair Competition Law; breach of fiduciary duty; breach of the implied covenant of good faith and fair dealing; negligence; unjust enrichment; and violations of the Maine Unfair Trade Practices Act.

12.     The jurisdiction of this Court is based on Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331 and 1332(d)(2)(a). This Court also has subject matter jurisdiction over the claims asserted herein pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332 (d)(2), since some of the members of the putative class (defined below) are citizens of a State different from that of the Defendant and, upon the original filing of this Complaint, members of the putative class resided in states around the country; there are more than 100 putative class members; and the amount in controversy exceeds $5 million, exclusive of interest and costs.

13.     The Court has personal jurisdiction over the parties because Robinhood conducts a major part of its national operations, advertising, and sales through continuous business activity in this District.

14.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because Defendants transact business in this District and a substantial part of the events or omissions giving rise to the claim occurred in this District. In addition, Robinhood and Robinhood Markets both reside in this District. The principal executive office of both companies is located at 85 Willow Road, Menlo Park, CA 94025.

15.     In connection with the acts, transactions, and conduct alleged herein, Defendants used the means and instrumentalities of interstate commerce, including the United States mails,

interstate telephone communications, and the facilities of national securities exchanges and markets.

## **PARTIES**

16.     Plaintiff Isaac Landreth is a client of Robinhood and was continuously during the Class Period. Plaintiff is a resident of the State of Maine. As detailed in his certification (attached hereto as Exhibit A), Mr. Landreth purchased shares of U.S. based exchange-listed stocks in trades executed during the Class Period and, as a result thereof, suffered damages from Defendants' unlawful conduct.

17.     Mr. Landreth resides in and is a citizen of Auburn, Maine. Mr. Landreth is 37 years old, falling within Robinhood's target market. On or around May 2017, Mr. Landreth began using Robinhood for brokerage services. Mr. Landreth chose to use Robinhood because, among other things, he read that Robinhood achieved best execution on client trade orders. Mr. Landreth relied on Robinhood's represented compliance with its duties of best execution and that all investment transactions would be made in compliance with state and federal law as stated in Robinhood's Customer Agreements, and Mr. Landreth reasonably expected Robinhood would comply with its duty of best execution, duty of undivided loyalty to him, duty to fully disclose to him all material facts, duty to refrain from acting adverse to his best interests, and duty to act in good faith.

18.     Mr. Landreth did not know about Robinhood's PFOF arrangements and their adverse effect on his trade execution prices. Mr. Landreth could not have learned from any publicly available source how much price improvement he lost on his orders as a result of Robinhood's actions. Had Mr. Landreth known that Robinhood had negotiated substantial PFOF for itself which diminished the execution quality of his trades, Mr. Landreth would not have utilized Robinhood's brokerage services. As a result of Robinhood's PFOF arrangements and

breach of its duty of best execution, Mr. Landreth incurred losses on many or all trades he executed during the Class Period, which amount to at least[7] one hundred and fifty trades by which Mr. Landreth bought and sold at least 10,000 shares of various equities. In all, Mr. Landreth invested at least $15,879.66 in equities through Robinhood's trading platform during the Class Period.

19.     Mr. Landreth was also injured because Robinhood's public misrepresentations and poor execution quality impugned the integrity of the trade executions by, among other things, adversely affecting the prices he and the Class members received on their investments. Mr. Landreth did not know of Robinhood's PFOF arrangements, their adverse effect on the price improvements realized on his trade orders, and that Robinhood was not fulfilling its best execution duties on his behalf, until such facts became publicly available. The amount of Mr. Landreth's losses can be determined through documents in Robinhood's possession and expert analyses of same.

20.     Plaintiff Jaime Marquez is a client of Robinhood and was continuously during the Class Period. Mr. Marquez is a resident of the State of California. As detailed in his certification (attached hereto as Exhibit B), Mr. Marquez purchased shares of U.S. based exchange-listed stocks in trades executed during the Class Period and, as a result thereof, suffered damages from Defendants' unlawful conduct.

---

[7]     Mr. Landreth was unable to retrieve monthly statements and other trading activity information for the period beginning May 1, 2018, and ending October 31, 2018, from Robinhood. Consequently, the trading figures noted above reflect substantially less trading activity than Mr. Landreth's actual trading activity. Mr. Landreth intends to obtain complete data sets through the discovery process.

CLASS ACTION COMPLAINT

21.     Mr. Marquez resides in and is a citizen of Hawthorne, California. Mr. Marquez is 28 years old and therefore is within Robinhood's target market. Mr. Marquez first opened a brokerage account with Robinhood on November 17, 2016, and began using Robinhood's trading platform the following February. Mr. Marquez chose to use Robinhood because, among other things, he read that Robinhood achieved best execution on client trade orders. Mr. Marquez relied on Robinhood's represented compliance with its duties of best execution and that all investment transactions would be made in compliance with state and federal law as stated in Robinhood's Customer Agreements, and Mr. Marquez reasonably expected Robinhood would comply with its duty of best execution, duty of undivided loyalty to him, duty to fully disclose to him all material facts, duty to refrain from acting adverse to his best interests, and duty to act in good faith.

22.     Mr. Marquez did not know about Robinhood's PFOF arrangements and their adverse effect on his trade execution prices. Mr. Marquez could not have learned from any publicly available source how much price improvement he lost on his orders as a result of Robinhood's actions. Had Mr. Marquez known that Robinhood had negotiated substantial PFOF for itself which diminished the execution quality of his trades, Mr. Marquez would not have utilized Robinhood's brokerage services. As a result of Robinhood's PFOF arrangements and breach of its duty of best execution, Mr. Marquez incurred losses on all trades he executed during the Class Period, which amount to nearly 900 trades—including, for example, 92 trades in September 2017 alone— by which Mr. Marquez bought and sold approximately 41,000 shares of various equities. In all, Mr. Marquez invested approximately $40,030 in equities through Robinhood's trading platform during the Class Period.

23.     Mr. Marquez was also injured because Robinhood's public misrepresentations and poor execution quality impugned the integrity of the trade executions by, among other things,

adversely affecting the prices he and the Class members received on their investments. Mr. Marquez did not know of Robinhood's PFOF arrangements, their adverse effect on the price improvements realized on his trade orders, and that Robinhood was not fulfilling its best execution duties on his behalf, until such facts became publicly available. The amount of Mr. Marquez's losses can be determined through documents in Robinhood's possession and expert analyses of same.

24.     Defendant Robinhood Markets, Inc. is a financial service holding company incorporated in Delaware with its principal place of business located at 85 Willow Road, Menlo Park, CA 94025. It is the holding company for Defendants Robinhood Financial LLC and Robinhood Securities, LLC. Defendant Robinhood Markets, Inc. is a named party to the Robinhood Terms & Conditions Agreement[8] governing Robinhood's website and mobile applications.[9] Defendant Robinhood Markets, Inc., facilitated, participated in, and communicated the PFOF misrepresentations and omissions to Plaintiffs and Class members and concealed their detrimental effect on the execution prices Plaintiffs and Class members realized on their trade orders.

25.     Defendant Robinhood Financial LLC is a full-service securities firm incorporated in Delaware with its principal place of business located at 85 Willow Road, Menlo Park, CA 94025. Defendant Robinhood Financial LLC is a wholly owned subsidiary of Defendant

---

[8]     Current version available at:
https://cdn.robinhood.com/assets/robinhood/legal/Robinhood%20Terms%20and%20Conditions.pdf.

[9]     Per the Robinhood home page: "Robinhood means Robinhood Markets and its in-application and web experiences with its family of wholly owned subsidiaries which includes Robinhood Financial, Robinhood Securities, and Robinhood Crypto." www.robinhood.com/us/en.

Robinhood Markets, Inc., and an affiliate of Defendant Robinhood Securities, LLC. It is an "introducing" broker-dealer, offering brokerage services to retail investors and allowing customers to open online accounts and electronically deposit funds. It is a named party to the Robinhood Terms & Conditions Agreement governing Robinhood's website and mobile applications. It is also a party to the Robinhood Customer Agreements,[10] governing the purchase, sale, or carrying of securities or contracts relating thereto and/or the borrowing of funds. Defendant Robinhood Financial LLC facilitated, participated in, and communicated the PFOF misrepresentations and omissions to Plaintiffs and Class members and concealed their detrimental effect on the execution prices Plaintiffs and Class members realized on their trade orders.

26.     Defendant Robinhood Securities, LLC is a full-service securities firm incorporated in Delaware with its principal place of business located at 500 Colonial Center Parkway, Suite 100, Lake Mary, Florida 32746. It is a wholly owned subsidiary of Defendant Robinhood Markets, Inc., and an affiliate of Defendant Robinhood Financial LLC. Once a customer creates an account with Robinhood Financial LLC, Defendant Robinhood Securities is the custodian of customers' funds and the securities customers purchase. It services customer accounts; executes, clears, and settles customer trades; prepares and distributes customer account statements and trade confirmations; and extends credit to customer margin accounts. It is a party to the Robinhood Customer Agreements governing the purchase, sale, or carrying of securities or contracts relating thereto and/or the borrowing of funds, which transactions are cleared through it. Defendant Robinhood Securities, LLC facilitated, participated in, and communicated the PFOF

---

[10]     Current version available at
https://cdn.robinhood.com/assets/robinhood/legal/Customer%20Agreement.pdf.

misrepresentations and omissions to Plaintiffs and Class members and concealed their detrimental effect on the execution prices Plaintiffs and Class members realized on their trade orders.

## FACTUAL BACKGROUND

27.     Robinhood is a privately-owned retail financial services company that offers customers the ability to invest in stocks, ETFs, options, and cryptocurrency through its website and mobile application. Robinhood is a registered broker-dealer and a member of FINRA.

28.     Since its launch in 2015, the Company has grown into a multi-billion dollar enterprise and is one of the largest retail broker-dealers in the United States. In October 2016 Robinhood reported 1 million users; by April 2017 its active user base had doubled and was growing at a rate of 140,000 new accounts per month. As of October 2018, Robinhood's users had "executed more than $150 billion in transactions.[11] In 2020, the Company topped 13 million users and was valued at over $11 billion.[12]

29.     Robinhood heavily markets their investment platform to young adults and novice investors and their customer base skews towards the young and inexperienced: The median age

---

[11]     Simone Foxman, Julie Verhage, and Suzanne Woolley, *Robinhood Gets Almost Half Its Revenue in Controversial Bargain With High-Speed Traders*, Bloomberg.com (Oct.15, 2018), *available at* https://www.bloomberg.com/news/articles/2018-10-15/robinhood-gets-almost-half-its-revenue-in-controversial-bargain-with-high-speed-traders (*last visited* Feb.19, 2021).

[12]     Richard Henderson and Miles Kruppa, *Retail trading app Robinhood's value tops $11bn on new fundraising*, Financial Times (Aug. 17, 2020), *available at* https://www.ft.com/content/b208cbbe-579c-4cbf-9358-01ae02b4381b (*last visited* Feb.19, 2021).

of a Robinhood user is thirty-one and a substantial number of their thirteen million users are first-time traders.[1314]

30.     Robinhood encourages its largely unsophisticated customer base to trade frequently, most notably by promising "commission-free investing" and "unlimited commission-free trades in stocks, funds, and options."[15] Robinhood has heavily promoted the fact that it does not charge trade commissions in its marketing materials.

### *How Robinhood Makes Money*

31.     Robinhood's primary source of revenue throughout the Class Period was PFOF[16] generated by selling order flow to a group of Trading Partners: private "market makers," broker-dealers, and hedge funds.

32.     When a customer places an order, Robinhood typically routes that order to Robinhood Securities for clearing and further routing to a Trading Partner. That firm then may "internalize" the client order by filling the order with its own inventory or matching it with a different client's opposing order. Alternatively, the Trading Partner may turn to external venues like national stock exchanges (*i.e.*, the New York Stock Exchange and Nasdaq Stock Market),

---

[13]     Massachusetts Complaint at 9.

[14]     *Robinhood Raises $280 Million in Series F Funding Led by Sequoia*, Blog.Robinhood.com (May 4, 2020), *available at* https://blog.robinhood.com/news/2020/5/4/robinhood-raises-280-million-in-series-f-funding-led-by-sequoia ("Half of new Robinhood customers this year were first-time investors.").

[15]     https://robinhood.com/; https://robinhood.com/signup.

[16]     During a some or all of the Class Period, Robinhood also generated revenue by collecting interest from loans to margin accounts and from customers' uninvested cash balances, as well as from subscriptions to "Robinhood Gold," a premium version of the platform.

regional stock exchanges, electronic communications networks (*i.e.*, a decentralized computer-based network that facilitates trades without traditional intermediaries), third market makers (*i.e.*, dealers that buy and sell orders even if there is not a buyer or seller immediately available for the other side of a transaction), and other alternative trading systems.

33.     Firms like the Trading Partners offer incentives to broker-dealers like Robinhood to route order flow to them. These firms benefit from the additional liquidity order flow provides and realize profits by exploiting the "dealer's turn," or the practice of buying at the bid price and selling at the offer. In other words, market makers incur up-front costs by paying to trade with retail stock investors, but nevertheless turn a hefty profit by pocketing the difference of the bid-ask spread.[17]

34.     When Robinhood first began operations in 2015, it relied on a single firm to provide clearing and order-execution services. That firm routed customer orders on to some of the Trading Partners in exchange for PFOF and shared a portion of that revenue with Robinhood.[18]

35.     Beginning in 2016, Robinhood stopped relying on that firm and began routing orders directly to the Trading Partners.[19]

---

[17]     Another manner in which retail brokers benefit at the expense of retail investors' best interests is by "flagging" their clients' orders as retail. Some trading partners pay brokers to flag their clients' orders as "retail" and charge fees to market participants, commonly high frequency traders, for access to such information through proprietary data feeds. Ordinary retail customers, however, receive no compensation for their orders being flagged. Meanwhile, high frequency traders or other market actors that subscribe to the feeds may use this information asymmetry to, for example, strategically execute against retail orders when their computerized trading models foresee shifts in the market for a given security.

[18]     Cease and Desist Order at 5.

[19]     *Id.*

CLASS ACTION COMPLAINT

36.     In or around May 2016, Robinhood began negotiating the terms of its order flow arrangements with the Trading Partners. During those negotiations, Robinhood and the Trading Partners reached an agreement regarding how to allocate the compensation for order flow.[20]

37.     Compensation for order flow can be paid to the originating broker-dealer directly as PFOF or, on the other hand, the trading partner can obtain "price improvement" on trade executions. "Price improvement occurs when a customer order receives an execution at a price that is superior to the best available quotation then appearing in the public quotation feed," the national best bid/offer price ("NBBO"), and creates benefit to the customer because they receive a better price than they would otherwise.[21] "[M]ost broker dealers obtain price improvements on the vast majority of customer orders that they send to principal trading firms." [22]

38.     PFOF, unlike price improvement, creates a conflict of interest between broker-dealers like Robinhood and their customers because PFOF is a benefit that accrues to the broker-dealer itself, and not the customer.[23] A broker-dealer's opportunity to provide price improvement

_____

[20]     Cease and Desist Order at 6.

[21]     Cease and Desist Order at 4.

[22]     *Id.*

[23]     *See* Letter from Sen. Carl Levin, Chairman of the Comm. on Homeland Sec. and Governmental Affairs' Permanent Subcomm. on Investigations, to SEC Chairwoman Mary Jo White (Jul. 9, 2014), *available at* https://www.hsgac.senate.gov/imo/media/doc/Ltr%20to%20SEC%20Chairman%20White%20re%20Equity%20Market%20Structure%20(July%209%202014).pdf ("The system creates a conflict of interest for stock brokers who have a legal duty to seek best execution of their customer's orders. [Paying for order flow] creates an incentive for brokers to route customer orders to venues that offer brokers the highest rebate, or conversely, away from venues that charge brokers the highest fee, even when those venues may not offer best execution. Academic and market research into order routing decisions suggest that the conflict is resulting in real harm to investors. . .

CLASS ACTION COMPLAINT

for a client's trade comes at the direct expense of PFOF. Given that market-makers make small amounts of money off of the spread on each trade, and that market-makers are only willing to pay so much of that money back to the broker, the payment comes in the form of either price improvements or PFOF.[24]

39.     At least one of the Trading Partners communicated to Robinhood that per the industry standard approximately 80 per cent of the value generated by order flow should be allocated to price improvement and the remaining 20 per cent to PFOF.[25] Robinhood rejected the industry standard and "explicitly offered to accept less price improvement for its customers than

---

A similar conflict exists in the practice of wholesale brokers paying retail brokers for order flow. Such payments create another incentive for brokers to maximize their own profits at the expense of best execution of customer orders. In addition, while retail brokers must disclose the amount they receive per-share from wholesale brokers for order flow, the aggregate totals of such payments are typically not disclosed. As a result, in most cases, consumers are unaware that the fractions of a cent received by retail brokers per-share add up to a multi-million dollar conflict of interest.")

[24]     Multiple studies have demonstrated that a broker-dealer's opportunity to provide price improvement for a client's trade comes at the expense of PFOF, with the likelihood of best execution inversely related to the amount of PFOF offered. *See* Nathaniel Popper, *Study Says Broker Rebates Cost Investors Billions*, NYTimes.com (May 6, 2012), *available at* https://www.nytimes.com/2012/05/07/business/rebates-to-brokers-are-seen-as-a-conflict-of-interest.html (discussing a May 2012 study by Woodbine Associates, Inc., finding that orders on venues that paid higher rebates were executed at prices inferior to orders on venues with lesser/no rebates and indicating that brokers who pursue the maximum rebate when routing orders achieve execution inferior to that which would be achieved by seeking lesser rebates); Robert Battalio, Shane Corwin, and Robert Jennings, *Can Brokers Have it All? On the Relation between Make-Take Fees And Limit Order Execution Quality* (Oct. 20, 2015), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2367462 (concluding that "routing decisions based primarily on rebates/fees appear to be inconsistent with best execution. There is a significant opportunity cost associated with routing all nonmarketable limit orders to a single venue offering the highest liquidity rebates.").

[25]     *See* Cease and Desist Order at 6.

what the principal trading firms were offering, in exchange for receiving a higher rate of payment for order flow for itself."[26]

40.     Ultimately, Robinhood negotiated a split that inverted the industry standard, allocating approximately 20 per cent of the value generated by order flow to price improvement and 80 per cent to Robinhood as PFOF. In other words, this would generate 400 per cent more PFOF revenue than the typical split and reduce price improvement by 75 per cent.

41.     It was a lucrative arrangement: Robinhood's PFOF payments constituted the majority of its revenue during the Class Period. As a private company, Robinhood is not required to disclose the components of its revenue, but a 2018 report based on its balance sheet filings with the SEC shows that PFOF is at the core of its business model. Between 2015 and 2018 Robinhood generated over $100 million in order routing payments[27]—all at the expense of its clients' trade execution quality. During 2017, Robinhood brought in an estimated $21.1 million in revenue from sales of order flow, a 226% increase over the previous year. In 2018 alone Robinhood generated approximately $69 million from sales of order flow, a 227% increase year over year and an amount that represents approximately 40% of the Company's total annual revenue.[28]

---

[26]     *Id.*

[27] Paul Rowady, *Robinhood: Payments for Order Flow 2018, Up 227%,* Alphacution.com (Mar. 29, 2019), *available at* http://alphacution.com/us-equity-payments-for-order-flow-up-42-for-2018/ (*last visited* Feb. 18, 2021).

[28]     Foxman, *supra* note 10.





**Robinhood Financial, LLC**
Estimated Order Flow Revenue

*Source: Alphacution, SEC, company data*

42.     Robinhood continued with this arrangement until the middle of 2017, when one of the Trading Partners attempted to renegotiate Robinhood's "unusually high payment for order flow rates."[29] Robinhood refused and stopped routing orders to that firm but continued to route orders to the other Trading Partners and collect its unusually high PFOF payments.

### *Robinhood Was Bound by the Duty of Best Execution*

43.     Robinhood, like all broker-dealers, owes its customers the duty of best execution.

44.     FINRA Rule 5310 establishes the factors relevant to a consideration of best execution:

> In any transaction for or with a customer or a customer of another broker-dealer, a member and persons associated with a member shall use reasonable diligence to ascertain the best market for the subject security and buy or sell in such market so that the resultant price to the customer is as favorable as possible under prevailing market conditions. Among the factors that will be considered in determining whether a member has used "reasonable diligence" are:
>
> (A) the character of the market for the security (*e.g.*, price, volatility relative liquidity, and pressure on available communications);

---

[29]     Cease and Desist Order at 7.

CLASS ACTION COMPLAINT

(B) the size and type of transaction;

(C) the number of markets checked;

(D) accessibility of the quotation; and

(E) the terms and conditions of the order which result in the transaction, as communicated to the member and persons associated with the member.

45.     In addition to this particularized review broker-dealers must conduct when executing clients' orders, FINRA Rule 5310, Supplementary Material .09(b) requires that every broker-dealer conduct a "***regular and rigorous review*** of the quality of executions of its customers' orders" routed outside the firm (emphasis added). Unless a broker-dealer conducts an order-by order review (which is required for internalizers), each broker-dealer must regularly review its order routing to evaluate which venue offers the most favorable terms of execution for a particular order. This includes, for example, execution price, execution speed, fill rate, and the likelihood that the trade will be executed.

46.     A broker-dealer's duty of best execution requires that the broker-dealer regularly review the execution quality of *all available venues*, not just those to which it currently routes orders. When the same security is traded in different venues, best execution requires that, absent instruction otherwise from the client, a broker-dealer ensure that the client's order be routed to the best possible venue based on a broker-dealer's regular and rigorous review of execution quality at available venues.

47.     A broker-dealer's duty to provide best execution for its clients' orders may not be transferred to another market actor or the execution venue. However, a third-party may incur the obligation. As explained by FINRA, "a broker-dealer that routes all of its order flow to another

CLASS ACTION COMPLAINT

broker-dealer without conducting an independent review of execution quality would violate the duty of best execution."

48.     FINRA instructs that when "a firm is routing order flow for automated execution, or internally executing such order flow on an automated basis, the SEC has indicated that simply obtaining the [NBBO] may not satisfy a firm's best execution obligation, particularly with respect to small orders," because routing to a venue that simply executes at the NBBO sacrifices the potential to obtain a superior execution price. Automatic order routing runs afoul of best execution where it is undertaken blindly, without regard to whether alternative venues would have provided superior execution quality.

49.     The duty of best execution, as formulated by FINRA Rule 5310, is mandatory for broker-dealers. Accordingly, a broker who fails to adhere thereto is subject to FINRA disciplinary actions, including permanent cease and desist orders.[30] A FINRA-registered broker cannot operate unless it assumes and carries out the duty of best execution.

50.     The SEC stated in its September 6, 1996, Release No. 34-37619A, Order Execution Obligations (the "SEC Release"), that a "broker-dealer's duty of best execution derives from common law agency principles and fiduciary obligations, and is incorporated in [self-regulatory organization] rules and, through judicial and SEC decisions, the antifraud provisions of the federal securities laws. This duty of best execution requires a broker-dealer to seek the most favorable terms reasonably available under the circumstances for a customer's transactions." That is, brokers have a responsibility to execute orders in a manner that is most beneficial to their clients and are prohibited from taking actions that are not in their clients' best interests.

---

[30]     *See* FINRA Rule 9291

51.     The SEC Release further states that:

> The duty of best execution evolves as changes occur in the market that give rise to improved executions for customer orders, including opportunities to trade at more advantageous prices. As these changes occur, broker-dealers' procedures for seeking to obtain best execution for customer orders also must be modified to consider price opportunities that become "reasonably available."

52.     Despite the inherent conflict of interest presented by the practice of selling order flow,[31] SEC rules permit sales of order flow in exchange for PFOF so long as the broker upholds its duty of best execution and documents the arrangement in its quarterly reports filed pursuant to 17 CFR § 242.606.

53.     FINRA also elaborated on the duty of best execution in Regulatory Notice 15-46, Guidance on Best Execution Obligations in Equity, Options and Fixed Income Markets, dated November 29, 2015, which noted that the SEC's Release No. 34902 (October 27, 1994), 59 FR 55006, 550009, provided that "an order routing inducement, such as receipt of payment for order flow, cannot be allowed to interfere with a broker-dealer's duty of best execution." FINRA stated clearly that "firms should not allow access fees charged by particular venues to inappropriately affect their routing decisions, and, in general, a firm's routing decisions should not be unduly influenced by a particular venue's fee or rebate structure."

### *Robinhood Violated its Duty of Best Execution and Harmed its Customers*

54.     Both the SEC and FINRA have found that Robinhood breached its duty of best execution in connection with the PFOF scheme described herein.

---

[31]     See notes 22 and 23 *supra*.

55.     On December of 2019, FINRA announced that it had levied a fine of $1.25 million against Robinhood "for best execution violations related to its customers' equity orders and related supervisory failures that spanned from October 2016 to November 2017."[32]

56.     Although Robinhood established a committee to review execution outcomes (the "Best Execution Committee") monthly beginning in 2016, FINRA nevertheless found that Robinhood failed to meet the reasonable diligence standard required by Rule 5310 because "Robinhood did not reasonably consider the quality of executions that [it] could obtain from alternative markets compared to the execution venues it used."[33] "The Best Execution Committee materials focused **only** on the execution quality of its pre-existing routing destinations,"[34] meaning that the Company failed to consider the relative advantages of alternative venues, "such as price improvement opportunities." [35] In other words, the Company did not consider routing to firms other than its Trading Partners.

57.     Additionally, the Company failed to regularly perform best execution reviews for several types of orders, collectively amounting to hundreds of thousands of orders each month,

---

[32]     News Release, *FINRA Fines Robinhood Financial, LLC $1.25 Million for Best Execution Violations*, FINRA (Dec. 19, 2019), *available at* https://www.finra.org/media-center/newsreleases/2019/finra-fines-robinhood-financial-llc-125-million-best-execution (*last visited* Feb. 18, 2021).

[33]     *FINRA Letter of Acceptance, Waiver, and Consent re: Robinhood Financial, LLC* at 5-6 (December 19, 2019), *available at* https://www.finra.org/sites/default/files/2019-12/robinhood-awc-121919.pdf.

[34]     *Id.* at 6 (emphasis added).

[35]     *Id.*

millions in total. These order types were not considered in the Best Execution Committee's review process at all. [36]

58.    Almost exactly one year later, on December 17, 2020, the SEC announced that it had found, among other things, that Robinhood violated its duty of best execution by entering into arrangements that ensured its customers would receive "inferior execution prices compared to what they would have received from Robinhood's competitors," and by "failing to conduct adequate regular and rigorous reviews of the execution quality it was providing on customer orders."[37] The SEC issued a $65 million fine and Robinhood agreed to retain an independent consultant to help it comply with its obligations.

59.    The SEC Cease and Desist Order also detailed some of the failures of the Best Execution Committee, stating that it "did not conduct adequate regular and rigorous reviews," "took no steps to determine whether Robinhood's payment for order flow rates were having a negative impact on the execution prices that Robinhood's customers received," and, until October 2018, "did not consider how Robinhood's price improvement statistics compared to those of other retail broker-dealers, or to the retail order execution market generally."[38]

60.    Beginning in October 2018, certain Robinhood personnel began comparing the firm's trade execution outcomes against other retail broker-dealers. They discovered that Robinhood's execution quality was worse than its competitors by most metrics.[39] By March 2019,

---

[36]    *Id.*

[37]    Cease and Desist Order at 2-3.

[38]    *Id.* at 6.

[39]    *Id.* at 7.

after conducting a more detailed analysis, Robinhood personnel had concluded that "its execution quality and price improvement metrics were substantially worse than other retail broker-dealers in many respects, including the percentage of orders that received price improvement and the amount of price improvement."[40]

61.     Robinhood's internal analysis showed that for orders exceeding 100 shares, its customers would be better off trading at another broker-dealer because the additional price improvement per order would exceed the cost of a $5 per-order commission fee. As the number of shares in an order increased, so too did the losses for Robinhood customers: "for orders over 500 shares, the average Robinhood customer order lost over $15 in price improvement compared to Robinhood's competitors, with that comparative loss rising to more than $23 per order for orders over 2,000 shares."[41]

62.     The SEC found that this scheme cost Robinhood's customers approximately $34.1 million "even after netting the approximately $5 per-order commission costs" charged by Robinhood's competitors.[42]

63.     Senior Robinhood personnel were aware of this no later than October 2018, although they knew or should have known of the issue as early as May 2016, when Robinhood first negotiated its PFOF arrangements with the Trading Partners.

***Robinhood Misrepresented and Concealed its PFOF Scheme and Poor Execution Quality***

---

[40]     *Id.*

[41]     *Id.* at 10.

[42]     *Id.*

CLASS ACTION COMPLAINT

64.     Throughout the Class Period, Robinhood withheld critical information regarding its PFOF arrangements and issued false and misleading communications regarding the quality of its trade executions. The Company began misleading its customers even before it officially launched and continued to conceal its PFOF arrangements and mislead the public regarding its order execution quality.

65.     In 2014, Robinhood's pre-launch website disclosed that the Company anticipated it would receive revenue from selling order flow. This information was contained in a Frequently Asked Questions ("FAQ") webpage under the heading "How does Robinhood make money?"

66.     Robinhood removed this disclosure at the end of 2014, most likely in response to negative media coverage of high-frequency trading firms, including some of its Trading Partners, that had a direct connection to the practice of selling order flow and could reflect poorly on the fledgling company. Robinhood personnel removed the existing reference to PFOF and created a new FAQ specifically for PFOF (the "PFOF FAQ"). That FAQ stated that Robinhood received only "indirect" and "negligible" PFOF at the time and promised that the Company would inform customers if PFOF became a significant source of revenue.

67.     In Robinhood's first year of operation, PFOF comprised approximately 80 per cent of the Company's total revenue. Contrary to its promise, Robinhood did not update its website to reflect this information or otherwise inform customers that PFOF was in fact the cornerstone of its business.

68.     Throughout 2016 Robinhood's revenues climbed substantially and PFOF remained the Company's largest source of revenue. Instead of disclosing this to customers as it had promised, Robinhood deleted the PFOF FAQ from its website. "Robinhood kept no records

CLASS ACTION COMPLAINT

1   showing when the payment for order flow FAQ was deleted, why it was deleted, or who was

2   responsible for approving its removal."[43]

3        69.    At the time Robinhood removed the PFOF FAQ the "How does Robinhood make

4   money?" FAQ contained no reference to PFOF revenues. Over the following two years

5   Robinhood updated the "How does Robinhood make money?" FAQ multiple times to reflect two

6   new sources of revenue—Robinhood Gold subscriptions and loan interest—but continued to omit

7   its reliance on PFOF revenue. The image below reflects the version of the "How does Robinhood

8   make money?" FAQ shown on the website between April 2017 and September 2018.



**How Robinhood Makes Money**

Robinhood Support
April 14, 2017 19:22

Follow

How does Robinhood make money?

With Robinhood Gold, you get up to 2x your buying power and access to after hours trading for as little as $10 per month. This is the only product Robinhood charges you for, and is completely optional. Trading is still commission free.

Additionally, Robinhood earns revenue by collecting interest on the cash and securities in Robinhood accounts, much like a bank collects interest on cash deposits.

16        70.    Robinhood sent its customers a link to this FAQ on multiple occasions and

17   between February 2016 and October 2017 linked to it on the home page of the Company's

18   website. That link was displayed under text reading "Learn how we make money" and "Say

19   goodbye to trading commissions." Nearby text stated "Robinhood started with the idea that a

20   technology-driven brokerage could operate with significantly less overhead. We cut out the fat

[43]   *Id*. at 7.

1    that makes other brokerages costly—hundreds of storefront locations and manual account

2    management."[44]

3         71.    Robinhood put forth effort to conceal its order routing practices, including

4    directing its customer service representatives to "avoid" the topic of order flow when responding

5    to questions about how Robinhood makes money. Training documents for customer service

6    representatives stated that it was "incorrect" to identify PFOF as a source of revenue. Thus,

7    customers who inquired about this topic between 2015 and August 2018—about 150 inquiries in

8    all—were fed misinformation.[45]

9         72.    Robinhood's disclosures about PFOF during the Class Period were scant and

10   insufficient to inform its customers of the conflict of interest at the heart of its business model.

11   For example, the Company's Customer Agreements and trade confirmations stated that it "may"

12   receive PFOF.[46] Robinhood disclosed some information pertaining to PFOF revenue in its

13   quarterly reports filed pursuant to 17 CFR § 242.606, but those reports were buried deep in its

14   website under a subsection of its "Disclosure Library" titled "SEC Rule 606 and 607 Disclosure."

15   Robinhood did not feature these disclosures on the home page of its website or communicate them

16   to customers, in contrast with the falsehoods about PFOF that it promoted heavily.

17        73.    Robinhood added PFOF as a source of revenue to its "How does Robinhood make

18   money?" FAQ in early October 2018 after a flurry of media reports concerning its PFOF practices.

19

20

21   _____

22   [44]    *Id*. at 8.

     [45]    *Id*. at 9.

23   [46]    *Id.*

24

Soon thereafter, Robinhood added a new FAQ to its website discussing PFOF and order execution quality. Below is an excerpt from the new FAQ page.[47]

**What is the execution quality for orders on Robinhood?**

Reg NMS ensures your order gets executed at the national best bid and offer, or better, at the time of execution. Our execution quality and speed matches or beats what's found at other major brokerages. Even when measured at the time of routing, our customers' orders get executed at the NBBO or better. By way of example, in August 2018, 99.12% of our customers' marketable orders were executed at the the national best bid and offer or better with an execution speed of 0.08 seconds from routing to execution (for S&P 500 stocks, during market hours).

74.     Robinhood's claim that its "execution quality and speed matches or beats what's found at other major brokerages" was false and Robinhood employees, including senior personnel, knew that it was false when it was published in October 2018.[48] At that time, Robinhood personnel compared the Company's order execution quality to that of its competitors and "learned that for most execution quality metrics, including the percentage of orders receiving price improvement, Robinhood's execution quality was worse." [49]

75.     By May 2019 Robinhood had completed a more in-depth study of its execution and found that

> "[n]o matter how we cut the data, our % orders receiving price improvement lags behind that of other retail brokerages by a wide margin." Robinhood further

---

[47]     *Id*.

[48]     *See id*. at 1 ("In October 2018, . . . Robinhood responded by claiming as part of an FAQ page on its website that its order execution quality matched or beat that of its competitors. However, at that time, Robinhood had begun comparing Robinhood's execution quality to competitors' and was aware it was worse in many respects.").

[49]     *Id*. at 7.

found that the amount of price improvement obtained for Robinhood customers was far lower than at competing broker-dealers, measured on a per order, per share, and per dollar traded basis. Senior Robinhood personnel were aware of this analysis.[50]

76.     Neither these findings nor the findings of October 2018 were released to the public or communicated to customers. Indeed, the false claims regarding execution quality remained on Robinhood's website until late June, when the SEC contacted Robinhood to express concern about it.

77.     Robinhood has continually acknowledged throughout the Class Period that it owes its clients a duty of best execution and claimed to consider factors relevant to fulfilling such duty when routing clients' orders. The Internet Archive "Wayback Machine" shows that during late 2016 and throughout 2017,[51] Robinhood's website stated: "As a Robinhood customer, your self-directed orders will receive the best possible trade execution."[52]

78.     Robinhood also asserts in the Customer Agreement that it would route its customers' non-directed orders based on considerations consistent with the duty of best execution. Throughout the Class Period, each new brokerage client was required to fill out and sign a Customer Agreement to open a trading account. In each Customer Agreement, Robinhood represented to its customers that with respect to non-directed orders, it would "transmit customer orders for execution to *various exchanges or market centers based on a number of factors*. These include: *size of order, trading characteristics of the security, favorable execution prices*

---

[50]     *Id*. at 10.

[51]     Specifically, Plaintiffs refer to archives of Robinhood's website captured on December 14, 2016, February 8, 2017, May 3, 2017, September 16, 2017, and October 26, 2017. *See* https://web.archive.org/web/*/http://robinhood.com/.

[52]     *Id*.

CLASS ACTION COMPLAINT

*(including the opportunity for price improvement), access to reliable market data, availability of efficient automated transaction processing and reduced execution costs through price concessions from the market centers*."[53] Robinhood further represented that "the order-routing policies, taking into consideration all of the factors listed above, *are designed to result in favorable transaction processing for customers*."[54]

79. During the Class Period, Robinhood's Customer Agreement was posted on its website and was provided to every Robinhood customer. The representations on the website and contained in the Customer Agreement were thus made to Plaintiffs and every member of the Class.

80. Per the SEC and FINRA, it is beyond dispute that Robinhood breached its duty of best execution in multiple respects. The Company failed to fulfill its duty of best execution because it (1) systematically routed orders based on its own financial interests rather than the considerations relevant to a best execution determination, and (2) failed to adequately review order execution as required by Rule 5310 (e.g., omitted from its best execution reviews several order types amounting to millions of orders), (3) did not evaluate alternatives to the Trading Partners.[55]

---

[53]    Robinhood Financial Customer Agreement (2016), *available at* https://d2ue93q3u507c2.cloudfront.net/assets/robinhood/legal/RHF Customer Agreement.pdf (emphasis added).

[54]    *Id.* (emphasis added).

[55] *FINRA Letter of Acceptance, Waiver, and Consent re: Robinhood Financial, LLC* (December 19, 2019), *available at* https://www.finra.org/sites/default/files/2019-12/robinhood-awc-121919.pdf.

CLASS ACTION COMPLAINT

81.     The foregoing statements by Robinhood regarding best execution are thus false and misleading. The Company routed orders not in a manner that was calculated to result in a best execution, but to maximize its own revenues. Indeed, it had negotiated arrangements with its Trading Partners guaranteeing that its customers would consistently receive worse execution quality than they would with Robinhood's competitors.

82.     Likewise, Robinhood's reliance on PFOF revenue was a material fact that the Company misrepresented, omitted, and concealed. The Company should have disclosed the truth about this practice because selling order flow for PFOF creates an inherent conflict of interest and did, in fact, cause its customers to receive lower quality trade executions that more than offset their saving on commission fees.

83.     Robinhood Markets is liable for all statements made by Robinhood because Robinhood's statements at all relevant times were attributable to, controlled by, and authored by Robinhood Markets.

84.     Robinhood and Robinhood Markets engaged in a common and uniform course of conduct as to all Class members by issuing misleading statements regarding material information and omitting material facts regarding Robinhood's order routing practices and failure to provide best execution of its clients' orders as required by FINRA Rule 5310. At all relevant times, Robinhood's actual routing processes and execution quality were within its peculiar knowledge and never disclosed to its customers. A diligent Robinhood customer could have scoured Robinhood's public disclosures and would only have learned that Robinhood, like any other broker, was subject to a legal duty of best execution, and seen Robinhood's representations that it complied with the requirements of this duty. Although Robinhood disclosed its sales of order

CLASS ACTION COMPLAINT

flow to the SEC and deep within its website, it contradicted these disclosures in public statements and client communications and otherwise concealed the truth of the matter.

85.     Accordingly, Robinhood's clients, including all Class members, are presumed to have relied on Robinhood and Robinhood Markets' (1) misleading statements claiming that they adhered to their duty of best execution and did not generate revenue from selling order flow, and (2) misleading omissions of PFOF revenue from their website and customer communications.

86.     At all times during the Class Period, Plaintiffs and the members of the Class relied on Robinhood and Robinhood Markets' representation that they would honor their duty of best execution in the course of routing Plaintiffs' trades. Plaintiffs similarly relied on Robinhood and Robinhood Markets' promises to comply with all legal and regulatory duties incumbent upon broker-dealers, including FINRA Rule 5310.

87.     Plaintiffs and the members of the Class also relied on Robinhood's misleading promise of "commission-free trading." Robinhood had to disclose its reliance on PFOF and the truth about its order execution quality to make its assertions regarding how the Company made money and the relative cost of trading on their platform not misleading. Robinhood issued these falsehoods and concealed the truth in an effort to encourage customers to continue trading on its platform and thereby generate more profit.

88.     Plaintiffs and the members of the Class were harmed by their reliance on Defendant's misleading statements and omissions. The SEC found that Robinhood's scheme cost its customers approximately $34.1 million "even after netting the approximately $5 per-order

CLASS ACTION COMPLAINT

commission costs" charged by Robinhood's competitors.[56] If Robinhood had disclosed the true cost of using its platform, Plaintiffs and the members of the Class would have sought the services of a competing broker or would not have placed trade orders with Robinhood.

## CLASS ALLEGATIONS

89.     Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(2) and/or (b)(3) of the Federal Rules of Civil Procedure for the purpose of asserting the claims alleged in this Complaint on a common basis. Plaintiffs bring this action on behalf of themselves and all members of the following Nationwide Class comprised of:

> **All persons in the United States who placed orders through Robinhood from September 1, 2016 to June 30, 2019 for which any Defendant received payment for order flow.**

90.     Plaintiff Landreth also brings this action on behalf of himself and a Maine Subclass comprised of:

> **All persons in Maine who placed orders through Robinhood from September 1, 2016 to June 30, 2019 for which any Defendant received payment for order flow.**

91.     Excluded from the Class and Subclass are the officers, directors, and employees of Defendants. Also excluded are the judge to whom this case is assigned and any member of the judge's immediate family.

92.     Plaintiffs reserve the right to modify or amend the definitions of the Class and Subclass, including after discovery.

---

[56]     *In re* Robinhood Financial, LLC, SEC Admin. Proceeding, File No. 3-20171 (Dec. 17, 2020) (order instituting administrative cease and desist proceedings) (hereinafter "Cease and Desist Order") at 10.

CLASS ACTION COMPLAINT

93.     *Numerosity. Rule 23(a)(1).* The members of the Class and Subclass are so numerous that their individual joinder is impracticable. Defendants service over three million brokerage accounts. Plaintiffs are informed and believe that the proposed Class contains at least hundreds of thousands of Defendants' clients who have been damaged by Robinhood's conduct as alleged herein, and the Subclass similarly contains at least thousands. Record owners and other members of the Class may be identified from records maintained by Robinhood and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

94.     *Existence of Common Questions of Law and Fact. Rule 23(a)(2).* This action involves common questions of law and fact, which include, but are not limited to, the following:

a.      whether Defendants' promises to provide, and assertions that they do provide, best execution of their clients' orders upon due consideration of the delineated regulatory factors, as discussed herein, are true, or are reasonably likely to deceive, given the omissions of material fact described above;

b.       whether Defendants' acts, as alleged herein, violated the federal securities laws;

c.      whether statements made by the Defendants' officers, directors, and employees to the investing public during the Class Period failed to disclose material information about Robinhood's order routing policy that would have rendered Defendants' best execution promises not misleading;

d.      whether Defendants' statements about providing best execution of their clients' orders were merely recitations of their legal obligations and not consistent with their actual practices;

e.      whether Plaintiffs and the other members of Class are entitled to damages; and

f.      whether Plaintiffs and the Class are entitled to injunctive relief, restitution, other equitable relief, and/or other relief as may be proper.

95.     *Typicality. Rule 23(a)(3).* All members of the Class have been subject to and affected by the same conduct and omissions by Defendants. The claims alleged herein are based on the same violations by Defendants that harmed Plaintiffs and members of the Class. By placing orders in connection with which Defendants failed to act upon due consideration of their duty of best execution, all members of the Class were subjected to the same wrongful conduct. Plaintiffs' claims are typical of the Class' claims and do not conflict with the interests of any other members of the Class. Defendants' unlawful, unfair, deceptive, and/or fraudulent actions and breaches of the duty of best execution concern the same business practices described herein irrespective of where they occurred or were experienced.

96.     *Adequacy. Rule 23(a)(4).* Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel experienced in complex consumer and securities fraud class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no interest adverse or antagonistic to those of the Class.

97.     *Injunctive and Declaratory Relief. Rule 23(b)(2).* Defendants' actions regarding the misleading statements and omissions relating to their routing of client orders are uniform as to members of the Class. Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief as requested herein is appropriate respecting the Class as a whole.

98.     *Predominance and Superiority of Class Action. Rule 23(b)(3).* Questions of law or fact common to the Class predominate over any questions affecting only individual members

and a class action is superior to other methods for the fast and efficient adjudication of this controversy, for at least the following reasons:

a.      Absent a class action, members of the Class as a practical matter will be unable to obtain redress. Defendants' violations of their legal obligations will continue without remedy, additional clients will be harmed, and Defendants will continue to retain their ill-gotten gains;

b.      It would be a substantial hardship for most individual members of the Class if they were forced to prosecute individual actions;

c.      When the liability of Defendants has been adjudicated, the Court will be able to determine the claims of all members of the Class;

d.      A class action will permit an orderly and expeditious administration of each Class member's claims and foster economies of time, effort, and expense;

e.      A class action regarding the issues in this case does not create any problems of manageability;

f.      Defendants have acted on grounds generally applicable to the members of the Class, making class-wide monetary relief appropriate;

g.      By pursuing a uniform course of conduct of routing their clients' orders without paying due consideration to their duty of best execution or disclosing to their clients that they were prioritizing receipt of order routing payments and/or reciprocal business arrangements over the factors relevant to a proper best execution analysis, Defendants failed to provide best execution as a matter of policy and practice to all members of the Class; and

CLASS ACTION COMPLAINT

h.      As a result of Defendants' order routing policy, each member of the Class suffered damages to an extent within the peculiar knowledge of the Defendants.

99.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## CAUSES OF ACTION
## COUNT I

## VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5

*Against Robinhood and Robinhood Markets*

## (ON BEHALF OF THE NATIONWIDE CLASS)

100.      Plaintiffs repeat and reallege each allegation contained in the above paragraphs as if fully set forth herein.

101.      This Count is asserted against Robinhood and Robinhood Markets and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder.

102.      Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Robinhood's routing of customer orders and any effect that Robinhood's routing procedures would have, or were likely to have, on the execution quality of its clients' orders.

103.      Defendants further have a duty of best execution, by which Defendants, as a dealer-broker, are legally required to seek the best price reasonably available for their clients' orders.

104.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy, and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class by systematically depriving them of best execution on orders.

105.    Defendants made numerous untrue statements of facts and omitted material facts necessary to make the statements made not misleading in light of the circumstances under which they were made.

106.    Defendants further employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities, including by routing orders only to third party trading firms that agreed to render Robinhood's demanded payment for order flow, despite this knowingly causing Defendants' clients to receive inferior execution rates.

107.    This scheme by Defendants, including the materially misleading statements and omissions thereunder, was intended to, and throughout the Class Period did: (i) deceive Defendants' clients, including Plaintiff and other Class Members; (ii) cause the Class members to engage in a broker-client relationship with Defendants, which they otherwise would not have done; (iii) cause Plaintiff and the Class to make orders which they otherwise would not have placed; and (iv) deprive Plaintiff and the Class of the best execution of their orders.

108.    Defendants knew that by failing to provide its clients with the best execution of their orders, each Plaintiff and Class Member would, and did, incur economic harm arising from executing Plaintiff's trades at prices less favorable than the best price available, including the chance to obtain a better price than the NBBO.

109.    Pursuant to their plan, scheme, and course of conduct, Defendants and their agents, including senior management, participated directly or indirectly in the preparation of public statements and reports, including statements made to Defendants' clients, governmental entities,

security analysts, and the media, that were designed to convince the public and general, and Plaintiffs and the Class in particular, that Defendants were providing commission-free trading at best execution price to their clients, when Robinhood and their agents knew that it was not.

110.    Such statements and omissions were materially false and misleading with regard to Defendants' order routing practices and the means by which the company was profiting from its clients through undisclosed, but systematic, payments for order flow.

111.    Defendants, Defendants' agents, and Defendants' senior management had actual knowledge of the materially false and misleading statements and material omissions alleged herein. Or, in the alternative, Defendants, Defendants' agents, and Defendants' senior management acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available.

112.    Defendants and Defendants' senior management had actual knowledge of, or recklessly disregarded, the plan and scheme by which the Robinhood routed orders for the purpose of extracting payment for order flow, despite this practice uniformly failing to satisfy Defendants' duty of best execution.

113.    Defendants are liable both directly and indirectly for the wrongs alleged herein. Defendants and Defendants' senior managers were able to, and did, directly or indirectly control the content of the misleading public statements and omissions made by Robinhood.

114.    As a result of Defendants' plan, scheme, conspiracy, and course of conduct, and the materially misleading statements and omissions made in furtherance thereof, Plaintiff and the Class placed orders through Robinhood with the reasonable expectation of receiving best execution throughout the Class Period.

115.    Without knowledge that Defendants were knowingly failing to satisfy their duty of best execution, which was concealed and misrepresented by Defendants through numerous platforms, Plaintiff and the Class placed orders through Robinhood, in reasonable reliance on the materially false and misleading statements and omissions, causing economic injury and damages.

116.    Defendants' plan, scheme, conspiracy, and course of conduct had a uniform effect on Plaintiffs and the Class, in that the diversion of order flow to principal trading firms who agreed to satisfy Defendants' substantial demand for payment for order flow caused uniformly inferior execution quality compared to the prices available on the market through other firms.

117.    Defendants' plan, scheme, conspiracy, and course of conduct constituted a fraud on the market, in that the price at which each stock is traded was presumably impacted by Defendants' fraudulent information, thus injuring every investor who trades in any particular security.

118.    Through the conduct alleged herein, Defendants have, knowingly or recklessly, directly or indirectly, violated Section 10(b) of the Security Exchange Act and Rule 10b-5 promulgated thereunder.

119.    At the time Plaintiff and the Class made orders with Defendants for securities, better prices were available to Plaintiff and the Class on each order, but these prices were not provided by Defendants.

120.    As a direct and proximate cause of Defendants' wrongful conduct, Plaintiff and the Class have suffered economic damages in connection with Defendants' routing of their orders and failure to satisfy its duty of best execution during the Class Period.

## COUNT II

### VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW

### (Cal. Bus. & Prof. Code § 17200, et seq.) ("UCL")

**(ON BEHALF OF THE NATIONWIDE CLASS)**

121.    Plaintiffs repeat and reallege each allegation contained in the above paragraphs as if fully set forth herein.

122.    Robinhood has engaged in unfair competition within the meaning of California Business & Professions Code section 17200, *et seq*., because Robinhood's conduct is unlawful and unfair as herein alleged.

123.    Plaintiffs, the members of the Class, and Robinhood are a "person" or "persons," within the meaning of Section 17201 of the California Unfair Competition Law ("UCL").

124.    The UCL prohibits any unlawful and unfair business practices or acts. Robinhood's conduct, as alleged herein, constitutes an unlawful and unfair business practice that occurred in connection with the provision of its financial and investment broker services.

125.    **Unlawful prong:** Robinhood's conduct, as described within, violated the UCL's unlawful prong because it: (1) constitutes violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5; (2) constitutes negligence; (3) constitutes a breach of fiduciary duty; (4) constitutes a breach of contract and/or a breach of the implied covenant of good faith and fair dealing; (5) violated applicable regulatory laws and guidance including from the SEC and FINRA such as FINRA Rule 5310 which requires best execution of orders fully and promptly; and (6) has unlawfully and unjustly enriched Robinhood.

126.    **Unfair prong:** Robinhood's conduct, as described within, violated the UCL's unfair prong because its conduct violates established public policy intended to regulate financial services to consumers, and because it is immoral, unethical, oppressive, or unscrupulous and has caused injuries to the Plaintiffs and the Class that outweigh any purported benefit. The utility of Robinhood's conduct to subordinate the financial interests of its clients to its own

financial interests is far outweighed by the gravity of harm to consumers who have now

incurred losses and damages they would not have otherwise.

127.     Plaintiffs have standing to pursue this claim because they have been injured by

virtue of suffering a loss of money and/or property as a result of the wrongful conduct alleged

herein.

128.     The UCL is, by its express terms, a cumulative remedy, such that remedies under

its provisions can be awarded in addition to those provided under separate statutory schemes

and/or common law remedies, such as those alleged in the other Counts of this Complaint. *See*

Cal. Bus. & Prof. Code § 17205.

129.     As a direct and proximate cause of Robinhood's conduct, which constitutes

unlawful and unfair business practices, as herein alleged, Plaintiffs and Class members have

been damaged and suffered ascertainable losses, thereby entitling them to recover restitution

and equitable relief, including disgorgement or ill-gotten gains, refunds of moneys, interest,

reasonable attorneys' fees, filing fees, and the costs of prosecuting this class action, as well as

any and all other relief that may be available at law or equity.  Additionally, because Plaintiffs

and Class members continue to have accounts and investments with Robinhood and intend to

use Robinhood's services in the future, injunctive relief is warranted.

## **COUNT III**

### **BREACH OF FIDUCIARY DUTY**

### **(ON BEHALF OF THE NATIONWIDE CLASS)**

130.     Plaintiffs repeat and reallege each allegation contained in the above paragraphs

as if fully set forth herein.

131.     As a provider of financial services and a registered securities investment broker-

dealer, at all times relevant herein Robinhood was a fiduciary to Plaintiffs and Class members

–42–

and owed them the highest good faith and integrity in performing its financial services and acting as a securities broker-dealer on their behalf. As a broker-dealer, Robinhood provides securities trading services by taking, entering, and executing orders, and provides information and advice to customers on investments and investment strategies.

132.   Robinhood breached its fiduciary duties to Plaintiffs and Class members by, among other things, failing to provide best trade execution quality, subordinating the interests of its clients to its profits through PFOF.

133.   Robinhood's conduct has caused Plaintiffs' and Class members' harm, losses, and damages and continues to expose them to harm because Robinhood continues to breach its fiduciary duties. These losses reflect damages to Plaintiffs and Class members in an amount to be determined at trial or separate proceedings as necessary.

134.   Robinhood's conduct has caused Plaintiffs and Class members harm, loss, and damages in an amount to be determined at trial.

## COUNT IV

### BREACH OF IMPLIED COVENANT OF GOOD FAITH & FAIR DEALING
### (ON BEHALF OF THE NATIONWIDE CLASS)

135.   Plaintiffs repeat and reallege each allegation contained in the above paragraphs as if fully set forth herein.

136.   Plaintiffs, Class members and Robinhood are parties to a Customer Agreement and related contracts.

137.   Robinhood unfairly interfered with Plaintiffs' and Class members' rights to receive the benefits of the Customer Agreement and related contracts by failing to provide best trade execution quality, subordinating the interests of its clients to its profits through PFOF.

CLASS ACTION COMPLAINT

138.    To the extent the contract gave Robinhood discretion regarding matters in the foregoing paragraph, Robinhood exercised its discretion in bad faith to maximize its own pecuniary benefit at the expense of Plaintiffs and class members.

139.    Robinhood's conduct has breached the implied covenant of good faith and fair dealing because it has caused Plaintiffs and Class members' harm, losses, and damages, and continues to expose them to harm because Robinhood continues to fail to perform under the Customer Agreement. These losses reflect damages to Plaintiffs and Class members in an amount to be determined at trial.

140.    Additionally, because damages may not be a full and complete remedy due to the ongoing nature of the relationship between the parties and the continuing risk of future harm, Plaintiffs and Class members seek specific performance of the contracts to ensure Robinhood refrains from similar conduct in the future.

## COUNT V

### NEGLIGENCE

### (ON BEHALF OF THE NATIONWIDE CLASS)

141.    Plaintiffs repeat and reallege each allegation contained in the above paragraphs as if fully set forth herein.

142.    As a provider of financial services and registered securities investment broker-dealer, Robinhood had a duty to exercise reasonable care, skill, and ability in conducting and facilitating financial services and transactions for its customers.

143.    Robinhood unlawfully breached its duties by, among other things, failing to provide best trade execution quality, subordinating the interests of its clients to its profits through PFOF.

144.     Robinhood's negligence and breaches of its duties owed to Plaintiffs and Class members proximately caused losses and damages that would not have occurred but for Robinhood's breach of its duty of due care. These losses reflect damages to Plaintiffs and Class members in an amount to be determined at trial.

## COUNT VI

### UNJUST ENRICHMENT

### (ON BEHALF OF THE NATIONWIDE CLASS)

145.     Plaintiffs repeat and reallege each allegation contained in the above paragraphs as if fully set forth herein.

146.     By its wrongful conduct described herein, Robinhood has obtained a benefit from Plaintiffs and Class members that includes, but is not limited to, receiving payments for order flow, and increased capital fundraising due to the high number of new and continuing users of its platform, which also drives up Robinhood's valuation.

147.     Since Robinhood's profits, benefits, and other compensation were obtained by improper means, Robinhood was unjustly enriched at the expense of Plaintiffs and Class members and is not legally or equitably entitled to retain any of the benefits, compensation or profits it realized.

148.     Plaintiffs and Class members seek an order of this Court requiring Robinhood to refund, disgorge, and pay as restitution any profits, benefits, and other compensation obtained by Robinhood from its wrongful conduct and/or the establishment of a constructive trust from which Plaintiffs and Class members may seek restitution.

## COUNT VII

### VIOLATIONS OF THE MAINE UNFAIR TRADE PRACTICES ACT

### (Me. Rev. Stat. Ann. tit. 5 § 205-a, et seq.)

–45–

**(ON BEHALF OF THE MAINE SUBCLASS)**

149.    Plaintiffs repeat and reallege each allegation contained in the above paragraphs as if fully set forth herein.

150.    Plaintiff Landreth brings claim on behalf of himself and the putative Maine Subclass.

151.    The Maine Unfair Trade Practices Act (Me. Rev. Stat. Ann. tit. 5 § 205-a, et seq.) ("Maine UTPA") prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. Me. Rev. Stat. Ann. tit. 5 § 207.

152.    Plaintiff Landreth, the proposed Maine State Class members, and Defendants are "persons" within the meaning of Me. Rev. Stat. Ann. tit. 5 § 206(2).

153.    The trades underlying this action constitute "trade" and "commerce" within the meaning of Me. Rev. Stat. Ann. tit. 5 § 206(3).

154.    Defendants were engaged in "trade" and "commerce" within the meaning of Me. Rev. Stat. Ann. tit. 5 § 206(3).

155.    Plaintiffs and the proposed Maine Subclass members made trades for personal, family, or household purposes.

156.    Prior to Plaintiffs' and the proposed Maine State Class members' trades, Defendants engaged in unfair and deceptive practices that violated the Maine UTPA.  As set forth in detail above, Defendants violated established public policy intended to regulate financial services to consumers, and engaged in immoral, unethical, oppressive, or unscrupulous conduct that has caused injuries to the Plaintiffs and the Class that outweigh any purported benefit.  The utility of Robinhood's conduct to subordinate the financial interests of its clients to its own financial interests is far outweighed by the gravity of harm to consumers who have now incurred losses and damages they would not have otherwise.

CLASS ACTION COMPLAINT

157.    As a direct and proximate cause of Robinhood's conduct, which constitutes unlawful and unfair business practices, as herein alleged, Plaintiffs and Class members have been damaged and suffered ascertainable losses.

158.    Pursuant to Me. Rev. Stat. Ann. tit. 5 § 213, Plaintiff Landreth and the proposed Maine State Class members seek an order enjoining Defendants' unfair and deceptive acts or practices, and awarding damages, punitive damages, attorney's fees, and any other just and proper relief available under the Maine UTPA.

159.    In addition, because Defendants have failed to remedy their unlawful conduct despite actual notice (including from customer complaints, similar lawsuits, and regulatory action about the allegations herein), the Maine State Class members seek all damages and relief to which they are entitled.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Robinhood, as follows:

      a.  For an order certifying the proposed class and subclass and appointing Plaintiffs and their counsel to represent the class and subclass;

      b.  Finding that Robinhood's conduct violates the statutes and laws referenced herein;

      c.  Finding in favor of Plaintiffs, the Class, and Subclass on all counts asserted herein;

      d.  Granting restitution, disgorgement and other equitable monetary relief to Plaintiffs, the Class, and Subclass;

      e.  Granting declaratory and injunctive relief to enjoin Robinhood from engaging in the unlawful practices described in this complaint;

      f.  Granting compensatory damages, the amount of which is to be determined at trial or through another separate proceeding;

      g.  Granting pre- and post-judgment interest on all amounts awarded;

h. Granting injunctive relief as pleaded or as the Court may deem proper;

i. Awarding Plaintiffs and the class members reasonable attorneys' fees and costs of suit, including expert witness fees; and

j. For an order awarding such other and further relief as this Court may deem just and proper.

### **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all issues so triable.

Dated: March 23, 2021

By: _/s/ Selin Demir_
Selin Demir, Esq. (SBN 331418)
**MIGLIACCIO & RATHOD LLP**
388 Market Street, Suite 1300
San Francisco, CA 94111
Tel: (415) 489-7004

Nicholas A. Migliaccio, Esq.*
Jason S. Rathod, Esq.*
Bryan Faubus, Esq.*
**MIGLIACCIO & RATHOD LLP**
412 H Street N.E.,
Washington, DC 20002
Tel: (202) 470-3520
* _pro hac vice_ anticipated

_Attorneys for Plaintiff_

–48–